Mr. Anderson, are you ready to proceed? Yes, I am, Your Honor. Okay. Please step forward. At this time, may I remove my mask? Yes. Thank you. It makes it a lot easier. May it please the Court, my name is Doug Anderson, and Mr. Kinsella is here with us today. This is an appeal by the State on behalf of the charity designated as Team Makers regarding the Bankruptcy Court's denial of its statutory constitutional claim for the excess proceeds that were returned by the Eighth Circuit after a protracted litigation in which it determined that the State did not have the authority to tax account wagering activities. As a result of that, $15 million were returned to the bankruptcy estate to be divided among the creditors. And at that point, shortly after that point, the State put in a creditor's claim on behalf of, first of all, all charities under its parent-parentized authority, which the Court rejected as not meeting the standards. And we also had a direct consent assignment from Team Makers, which was one of the charitable organizations participating in the account wagering process. And what we put in a claim for was consistent with the constitutional provision of Article 11, Section 25, that requires that any law passed by the North Dakota legislature, as far as games of chance, requires that the entire net proceeds of the games of chance be devoted to, and I'm paraphrasing, charitable and other public-spirited uses. And it's based on that constitutional provision that we believe the charity has a claim. So, let me ask you this, Mr. Anderson. We are in bankruptcy, which is governed by Federal law and a specific distribution scheme under the Bankruptcy Code that has been adopted and legislated by Congress. Can you explain to me how the North Dakota Constitution overrides that Federal statute? Well, it doesn't override it. What happens was the constitutional provision allows a law to be put into place that authorizes the account wagering. No, I understand that. But now we have this pot of money that's under the jurisdiction of the bankruptcy court and in the bankruptcy estate of RSI. Why would something arising under the Constitution of North Dakota somehow govern how the bankruptcy court distributes proceeds under the statute by the priorities that are in the code? The constitutional provision does not override or govern it.  It would be more of a contractual-type claim. These entities enter into claims which require that the entire net proceeds go to charitable gambling. And can you tell me where in the proof of claim or in the record is the contract you're relying upon for that? The contracts are within the proof of claim that we supplemented in, I believe it was in October of 2020. There was a series of contracts between RSI and team makers that... So we look to the proof of claim 51-2 to find those contracts? Is that what you're saying? That's where the contracts are. But then we have a disagreement with the extent of those contracts, whether those were fully complied with, whether those were really stated what was to be given. And in the end, they don't say, there's no proof in them that they're being given the entire net proceeds of the wagering. Well, let me ask you this. When Judge Erickson issued his opinion in the district court, I believe in the record before him, he mentions that team makers actually entered into a contract with RSI to essentially sign over to RSI the right and requirements to do the duties that team makers would have done as the operator. Does that in any way affect this contract that you're talking about? Well, that all leads up to it. There's a long history. And we know the history, so you can truncate it to just these issues. Yeah, that's part of it. You know, the RSI turned over, team makers turned over the responsibilities to RSI to conduct the account wagering, or at least at that time, the parimutuel wagering. I think there's a disagreement along the line whether that had to be done with respect to the account wagering. Oh, okay. I think there was some reference in there that you didn't have to do that with respect to account wagering because under 5306.1-11 or 10.1, if they were licensed as a service provider, they could do that without having to get an additional license. Mr. Anderson, you talk a lot about net proceeds. Is there anywhere in the record that net proceeds is defined? I mean, it's sprinkled liberally throughout your brief, and Ms. Bala comments on it in her brief. Can you point me to anything where these net proceeds that you're talking about and the entitlement thereof, what does it consist of? Has it ever been defined or is it this vague, undefined concept? Well, I think there's a lot to be read into the 2007 and 2015 decisions, and that's the premise. We rely on the four corners of the documents for everything, so we don't go in and create other arguments like they've said we've done. But if you read the 2007 criminal case, there's a lot to it. First of all, it starts off with the suggestion that the parimutuel statutes at the time controlled the distribution of the proceeds of account wagering. And now we know that as we go into 2015, that the legal effect of that statement has been taken away, but at least for race judicata and maybe operative fact purposes, they did make a statement that here's the formula that's to be used or was being reused by the parties. But then they go on further. Who is they? I'm sorry. Who is they? The parties, which would have been anywhere from RSI to the bettors to the charities to the account wagering participants, maybe is a better term. But if you go on further into that discussion, they kind of look at a glimmer of hope regarding the games of chance statutes under 5306.1, which is just above our parimutuel statutes. And they say that they make the reference that that does reference net proceeds. The trouble is it says it's vague, and we don't know if it applies. But if you go in and look at the definition, and again let me back up, the definition of net proceeds under the games of chance were promulgated under the auspices of the constitutional provision, much the same as the parimutuel statutes were promulgated. So under principles of North Dakota construction, if you have a definition in one section, it applies to other sections unless there is a contrary intent. So that's our first starting point. There's no indication that the net proceeds definition for games of chance should not apply to parimutuel wagering. And again, it's a broad statement. It says gross proceeds minus expenses, commissions, and gaming tax, I think gives us a definition of net proceeds. And again, the court called that vague. But then there's other constitutional provisions that I cited within our brief from Alabama and New York that use the same what could be considered vague language, but it comes up with the same Black's Law Dictionary that probably equates to generally accepted accounting practices. So there is a definition. But Mr. Anderson, if it's so vague, how can you have established a breach of contract claim? In order to have a breach of contract claim, you've got to prove the contract, you've got to prove breach, and you've got to prove damages. So my question to you then is if it's so vague, then how have you nailed down an amount of damages and proven a contract claim? What is the number and how do you get there? Well, I think I'd like to take a moment to disagree with it being vague. There were some statements made within that. The Eighth Circuit said it was, correct? It made the statement that it was vague within a criminal context where they're strictly applying the law to the defendant. And so the rule of lenity does not necessarily apply. Well, you don't have any compunction about citing the Eighth Circuit, even in the criminal cases, and trying to apply it here. So why should it make any difference? There are nuances. I mean, we just can't. I mean, when we look at the other cases that I cited from other jurisdictions, it's the go-to definition. I mean, we don't have anything better than that. The one thing, too, is we got hung up in this Eighth Circuit case with the testimony of this horse racing director who said it could be as little as you want or as much as you want. I'm just not following your argument. In front of the Eighth Circuit there was testimony? Well, they said it was inherently vague. Then there was a testimony. And are you talking about the tax case now? No, it was the terminology of the vagueness of the net proceeds. Okay. I know what you're referring to. You're referring to the Eighth Circuit's reference to the commissioner's testimony about what has to be paid on the contracts between the service provider and the other entities involved. But you assert that it's wrong, but I don't believe you demonstrate why it's wrong. Why is it wrong? Well, I think it's inherently wrong because to say when you have a constitutional requirement of the entire net proceeds, whatever that might be, yet you say within that context it could be as little as you bargained for or as much, those two statements are incongruent and just plain incorrect. The testimony was just incorrect. One thing I'd like to note, too, that there's so much in these cases, but as you go on to the 2009 case, it pointed out the fact that statements regarding irregularities or uncertainties in the regulatory environment, which might be the vagueness, were not necessary to the decision of the case. And I get out of it, it's referring to that whole part as dictum. Isn't that true of many, if not all, of the citations that you have to the various Eighth Circuit cases? I can't agree on that. They're not holdings? They're just observations or comments about the background? That may be true to some of them and not. But I think that there is a contractual relationship that gives rise to this, and that's a whole different part of this that is secondary. But when we look at that, this is really controlled by the four corners of the two Eighth Circuit cases. And the Eighth Circuit case made it clear throughout its lineage, going from the 2007 case to 2009 and then again in 20, it says, when I read it, is that BALA conducted racing services account wagering without paying a penny to the charities. The takeaway I get to it from that is RSI owes team makers some sum of money. It owed it in 2007. It owes it in 2020. Okay. So let me back up a little bit and refocus us to the bankruptcy code. I think that at some point what I guess I'm hearing you say is that team makers has a claim that has priority over Ms. BALA or RSI. And the way the bankruptcy process works is when the funds that proceeded from the settlement agreement between the trustee and North Dakota on the funds that were illegally collected, those came into the bankruptcy estate. And your brief and some of your arguments seem to imply that Ms. BALA has asserted some kind of ownership interest to those funds. And so you're required to prove that you have a claim. And if you don't have a claim, the bankruptcy code requires that the funds go back to the debtor if all claims have been, all allowed claims have been paid in full. So I guess I'm unclear why you think there's some windfall to RSI or to Ms. BALA under the bankruptcy distribution scheme. I'm not understanding that because that's the way the code goes. If all allowed claims have been paid in full, then this is where the money goes. And I guess I'm not understanding your argument that notwithstanding those statutes that somehow North Dakota or team makers is entitled to those funds. I'm just not understanding that. Well, and I guess that goes to our disagreement whether those are the property of the debtor. I mean, they went into the bankruptcy estate. But who else's property would they be? The debtor paid those taxes, right? They were assessed and the debtor paid them. Those funds came back to the estate because North Dakota had no ability to collect those taxes on account wagering. So who would those proceeds belong to if not to the debtor? Well, we believe it goes to the charities. But when did the charity's claim arise? You only raise that claim after the money became available. You don't invent a claim because there's funds available. You either have a claim at the beginning of the case or you don't have a claim at the beginning of the case. And that's where I'm just confused. Well, I think the trustee at one point came out and said, what is Racing Services' interest in these funds? Was this a trust relationship? That has never been established. I think early on in the whole pleading, we questioned whether this whole scheme set up a trust arrangement. They may have taken on the responsibility of paying the funds. That does not mean they owned it. That's where we fall back. It may be that we're reading more into it than we should be. But the Eighth Circuit in its 2015 argument made some pretty strong statements regarding without the assessment of taxes, more money is made available for beneficent purposes. That gets back to my comment before. That's one of those examples, it seems to me. That's not a holding in that case, is it? That was just a comment by the Eighth Circuit about the arrangement. And you're converting that into a basis for a claim, it seems to me. It's carrying a great deal more weight than it should. At least that's my thought, and I'm giving you the opportunity to respond to that. Well, we put a lot of weight into that, the way it's worded. First of all, that statement says that the constitutional provision applies to account wagering. Didn't the Eighth Circuit decide precisely the opposite? That the account wagering, the take-out statute does not apply to account wagering? The take-out statute doesn't apply. But, pardon me, maybe I phrased it. The constitutional provision of entire net proceeds works with account wagering. It's not exclusion. There is a substantial part of the appellee's brief in which they argue that constitutional provisions don't give a basis for anybody to assert claims against private parties. It's merely a limitation on the power of the legislature to enact statutes in this area. And I don't think I saw much of a response in your briefing, if any, to that point. So would you like to respond now? Yeah. It's once the Constitution doesn't give a rise to it, doesn't give a private cause of action, but once the charity starts engaging in it through the contract, it creates a right. So it's all based on contract, then, not the Constitution. So there is no statutory claim. There's just a contract claim. It's not whole and separate. If the contract violates the constitutional provision, then it's a void. So we might have to make sure that the contract, whatever it might be, is complying with the entire net proceeds requirement. When you say whatever the contract might be, it's my understanding that the contracts you're relying on are attached to the proof of claim. That's the contracts we look to. Right. Okay. Well, I believe the appellee has made the point that the contracts don't necessarily stand on their own. If you look at the language of the ones that you put into the record, they don't necessarily make clear that they were in effect during an applicable period, and there may have been some ambiguity in them with respect to the payment amount. How do you respond to those contentions? Well, those were the contracts that were submitted to the Racing Commission for approval as part of the licensee. So those are the only ones we're aware of. As far as the ambiguity, we believe it's clear from the four corners of the document. Mr. Anderson, let me clarify. You keep saying that the funds belong to the charities, plural. There's only one charity here, that issue, because of the parents' patriae theory went out the window. Correct. So the only entity, the only charity, is TeamMakers. Is TeamMakers. And did TeamMakers ever file a proof of claim on their own? Not on their own. And you stand, the State of North Dakota stands, in the shoes of TeamMakers. Through a consent and assignment agreement signed by TeamMakers. So whatever TeamMakers had, you now have. Or not have, as the case may be. Correct? Well, we have to look at the consent and assignment agreement. It speaks to how it will be divided up and remitted. But right now, we're representing the interest of that charity in this case. And only that charity? Only that charity at this point. So getting back to the nub of your basis for saying Judge Collins committed reversible error, and I see you're almost out of time, but can you boil that down in essence, what you're complaining of that Judge Collins should have done, or where he got it wrong? And I know laches is out the window, but he used the Court's inherent authority in Section 105 to say, you know, isn't enough enough? And I think the phrase that I see sprinkled throughout the briefs is the trial on put up or shut up. You know, now is your chance. So what did he do wrong? I guess that's what I'm trying to figure out here. Well, I think that argument that we raised went to the contract issue, and that we didn't have our ducks in a row at the time it came before the Court. But we feel that that does not apply with respect to the constitutional or statutory issue. I mean, we still have Eighth Circuit saying that more money is, and I know you disagree on whether that's a holding, but it's a certain inclination of where this is going. Let me ask you this, because I think this goes partly to Judge Ridgeway's question in terms of you know, we keep coming back to that language in the Eighth Circuit, but what claim did team makers hold on the date that RSI filed bankruptcy? It held the claim for money, some sum of the money that the For net proceeds not paid to it by RSI that should have been. Right, through the 1318. So if that's the case, and these contracts extend that far back, why didn't North Dakota or team makers file a claim earlier than now? Well, I believe that up to that point, we were still fighting whether the taxes should be returned. That took a substantial portion of the time, obviously. Thank you.  Do you have a deal with PWE to share any recovery that you make in this case? Yes. How is that consistent with the notion that all the net proceeds are supposed to be paid to charities? Well, I've thought about that, too, within the context of the Mayer v. Hawkinson case. There was a 2001 ND78, and that was where there was an agreement, a gambling agreement, from the front to split wagering proceeds. We see this as different as this is not, we're not entering a gambling for a win for wagering proceeds. It's an agreement to pool resources for the best interest of, you know, considering that there's a risk that one might lose and one might win. If PWE won, I think that's up front for the state, if PWE was to win, then we'd be off the table and we would have gotten half those proceeds for the team makers with no effort and no risk. It's not, in a sense, an even split always. It's the winner, whoever wins prevails. It's not a gambling contract. All right. Thank you for responding to my question. Okay. Thank you. For the appellee.  of Fredrickson & Byron on behalf of appellees Susan Bala and RSI Holdings, Inc. While this case certainly has a complicated history that this Court is aware of, the issue before the Court today is something that is simple and fundamental and arises in nearly every single bankruptcy case in this country, and that's the allowance or disallowance of a proof of claim. The Bankruptcy Code clearly defines a claim as a right to payment. It's important to note that a proof of claim was filed in this case and the State is asserting a right to payment in that proof of claim. Now the State is not asserting a right to payment that it owns as a State of North Dakota, but instead is appearing here on behalf of team makers, which means that the State has to prove that team makers, a private non-profit entity that supports sports programs in North Dakota, has an actual right to payment from the RSI bankruptcy estate. The Bankruptcy Court evaluated the State's legal arguments and the evidence that the State submitted and determined that the State failed to satisfy its burden of proof in showing that team makers has a claim. Generally the definition of a claim is quite broad, and keeping that in mind, if there was a relationship between RSI and team makers at the time of the bankruptcy filing, I guess wouldn't it be prudent to list anybody you thought had a claim and perhaps there was some kind of contingent or unliquidated claim that team makers may have held on the date of filing? I apologize, Your Honor. You said list? Do you mean list as a financial creditor? Yes. Yes, because the appellant does contend, I know you responded to it, that team makers didn't have notice of the bankruptcy. They weren't listed initially. Correct, Your Honor. And I'm in a slightly awkward position because I did not represent to the debtor when the schedules were filed. However, my understanding is the belief at that time was that team makers did not have a claim, that the parties had, well, for at least the three years, the three relevant years when account wagering was in effect, had a contractual relationship in which RSI paid a percentage of all of account wagers that it took in through the team maker's site and that team makers never complained that it was underpaid, never sought to argue that it would get more and continued to enter into a contract each year with RSI and submit that contract to the Racing Commission in order for both RSI and team makers to be licensed to operate the parimutuel system. So if that money came back into the estate that was collected by taxes that were not authorized, would that then have led to a claim that team makers could make for some of those proceeds? No. So if you actually look at the contract between RSI and team makers, it's clear that team makers essentially assigns any responsibility for taxes to RSI. So RSI was the party that was responsible for paying taxes and the record even further supports that. At no point when RSI was late for paying taxes did the state reach out to team makers and ask them to pay taxes. No, the state always contacted RSI and demanded that RSI pay taxes. And I want to speak for a second here on the 1318 site, and I will, but just briefly on that point, when the state was arguing that RSI was not paying taxes on the 1318 site, which is part of the reason why the criminal case was started and also why a receiver was appointed over RSI, the state, again, did not seek to recover those taxes from any of the site operators, any of the charities, but instead looked solely to RSI and used that as a basis for the appointment of a receiver. And now this provision that you're referring to now is in the contract or contracts attached to the proof of claim filed by the state in this case? Correct, Your Honor. So each year the, sorry. Well, I was just going to say, I don't recall this argument being made in your briefing. Is it there and I missed it? Your Honor, this argument was raised in the lower level briefing before the bankruptcy court when the issue was whether or not there was a responsibility to pay taxes and who was sort of the licensee under the statute and was responsible. The state sort of at that time was arguing that TMAKERS, as the site operator, was responsible for paying the taxes. We argued against that before the bankruptcy court, and then here on appeal, the state is not arguing that TMAKERS was responsible for paying any of the taxes. The state is arguing about the constitutional right to net proceeds and then a right under the takeout statute and then a separate right under an addendum to the contract. So I appreciate it. Well, if the money that came back was taxes and it had been paid by RSI, then wouldn't that be a defense to TMAKERS' claim? Yes, Your Honor. And we asserted that defense before the bankruptcy court, and we didn't raise that in our brief here because the state is not arguing that the site operator is the taxpayer anymore. The state is instead arguing that it has this concept of net proceeds or that the takeout statute requires the money to be paid to TMAKERS. So I understood that TMAKERS was the operator responsible for paying certain things out of proceeds that RSI obtained. And did that include distributing charitable, I guess, contributions or charitable payments to itself and other charities, or did it just get to keep everything? So, Your Honor, the pari-matrial statute was very unclear, especially once account wagering was approved. So there is uncertainty regarding who is truly responsible for paying the listed expenses that appear in the regulations, and that mainly turns on the term licensee. When account wagering was authorized by the state of North Dakota, it designated the service provider to be the licensee for account wagering. And so references in the regulations to the licensee being responsible for paying all the different expenses, it's unclear if it was referring to a site operator or if it was referring to RSI. But the contract itself actually solves that problem because the contract with TMAKERS lists all those expenses and says that it is RSI's responsibility. Essentially, the contract between RSI and TMAKERS puts all the burden on RSI to pay all the necessary expenses and comply with the statute and then guarantee a certain percentage that had been paid to TMAKERS as a site operator. Okay. Let's talk about the contract claim for a minute. The court below rejected it on both procedural as well as substantive grounds. Yes, Your Honor. Let's talk about the procedural ones because the appellant complains that essentially what the court did was an end run around our opinion that LATCHES is not applicable. What's your response to that? Your Honor, I understand that this Court's decision on LATCHES was that there's a statute of limitations inherent in the Bankruptcy Code that says that as long as a late filed claim is filed prior to distribution, that the court needs to consider and determine whether or not that should be allowed or disallowed. What the State is trying to do here was make an oral motion to amend the claim at trial. It's not filing a new claim. It's offering a new legal theory in support of its claim. The court then evaluated whether or not it should permit the State to amend the claim, which we believe is under an abusive discretion standard, and applied the same factors that courts look to under Civil Rule 15, looking to undue prejudice, undue delay, and whether or not that amendment should be allowed. And after conducting that analysis, the court determined that the State did have undue delay in bringing forward this alternative theory for their claim and that it would be prejudicial to Ms. Bala and the other parties because the State sought to amend at the end of trial after the close of evidence. And so our argument is that this is not a new claim that the State is bringing. It's rather a claim amendment, and that this court should evaluate that as an amendment under the abusive discretion standard. And importantly, the State has not challenged the application of the abusive discretion standard. The State has not demonstrated any error in Judge Collins' opinion in deciding not to allow the amendment, or any of Judge Collins' findings regarding undue delay and prejudice to Ms. Bala. The State then filed what it calls its new claim, or its amended claim, which is 51-2. However, the bankruptcy court there said that's not actually a new claim. That's not even the claim amendment. You didn't seek relief from the court. What that really is, is it's trying to supplement the record with additional evidence. And so the court evaluated whether or not that was a proper attempt to supplement a closed evidentiary record. And again, the case law shows that that's an abusive discretion standard, and the bankruptcy court determined that the State had the evidence it's thought to add prior to trial, and so found that it should not be permitted to amend after trial because of the prejudice that would occur to Ms. Bala. Okay, let's talk about this, his substantive ruling. In order to have a claim for breach of contract, you've got to prove contract, breach, and damages, right? Right. Okay, so first, let's talk about the contract. They attach certain to their proof of claim. So why isn't that sufficient to establish the first element of a proof of claim? Your Honor, there's certainly a contract into the record, but nobody at the trial testified if that contract applied. And as pointed out, and Ms. Bala's appellee brief, there's certain timing questions. So your contention is it's not apparent from the face of the contract that it's applicable to the situation being litigated? Correct, Your Honor. In what way? Well, Your Honor, in the contract itself, it has a deadline, a termination deadline, and it would require the parties to renew that contract. And there's no evidence in the record that that contract was ever renewed. All right. Let's talk about the breach and the damages. Basically, their claim is pretty simple. They were supposed to pay a certain percentage of the handle, right? And they have a number about what the handle was. I think they say the claim is $99 million. And so we know what they should have paid the team makers. And there's some evidence, although maybe a little sketchy, but I'd like for you to comment on it, about what team makers was actually paid. So why doesn't that establish a breach of contract claim? Your Honor, I think we have to look at what evidence was actually in the record. So in the record, there's evidence about what the handle was. So you can definitely calculate, even based under the state's theory of the contract, what amount should have been paid to team makers. What is absent in the record is any evidence that team makers was not paid that amount. There's evidence that team makers was paid some amount. I think it averaged around $260,000 a year. But there's no evidence offered by the state, no testimony, no exhibits, that would show that team makers wasn't paid more or wasn't paid the amount that it's asserting that team makers wasn't paid. And I think the state recognizes that because when the state filed its, you know, quote unquote, amended claim, it attached a declaration from an employee of team makers that identified what the amounts would be and alleged that team makers wasn't paid. That was information that they were trying to supplement the record, which the court denied. Correct, Your Honor. And so if we look at the record that the court, that Judge Collins used, there is nothing in the record that proves a breach of the contract, even under the state's theory of what the contract says. And then, as an extension of that, there is nothing in the record that proves what the damage amount would be because we don't know how much team makers was not paid based on the record before the court. And nobody from team makers appeared to testify at the hearing in May in front of Judge Collins? Correct, Your Honor. The only witness was a Mr. Foley who was counsel for PWE, is that correct? Correct. And he clammed up invoking attorney-client privilege during many of the questioning, correct? Correct, Your Honor. Did he opine on anything to do with the relationship between team makers and the state of North Dakota? Yes, Your Honor. So Mr. Foley attempted to talk about the contract. He attempted to offer his interpretation of the contract. Ms. Fala's counsel objected, and we argued that Mr. Foley was not a party to the contract, and the court said that he would allow the testimony but would give it whatever weight he believed it was necessary. Which wasn't much, apparently. Correct. In the judge's opinion, the judge says that he did not find Mr. Foley's testimony to be credible, mainly because Mr. Foley, as a representative of PWE, there was a vested interest in the recovery, and also Mr. Foley was not a party to the contract, was not there when the contract was signed, and was simply offering an opinion about what the contract said. All right. Let's talk about what I think is the State's principal claim, at least with respect to the statutory claim, and that is they cite a number of quotations from Eighth Circuit opinions and basically contend that the Eighth Circuit has already decided that your client owed money to team makers or to charities that it has not paid. What's your response to that? So two main responses. Number one, the State cites to the 2015 Eighth Circuit opinion and the phrase that if taxes aren't collected, then there's more net proceeds available for charities, is essentially. I'm not quoting it directly here. What the Eighth Circuit was actually responding to was the State's argument that if taxes weren't collected, the parimutuel statute would be unconstitutional because there wouldn't be any requirement to pay charities. What the Eighth Circuit was doing was responding to that statement and suggesting that if there are no taxes, there's certainly more money available to be divided up between the service provider and the charity site operator. But that language does not create a claim, correct? Correct. And I was about to get to that, and so thank you, Your Honor. That just says that there's more money available, but there's no holding that says that a charity such as team makers can argue that that's a claim against the bankruptcy estate. It simply is a statement that there's more money available for all the parties. Okay, and I think there's also a statement in the 2007 opinion of the Circuit Court upon which they rely. Your Honor, that's where it gets a little bit confusing. They cite to a 2009 Eighth Circuit opinion, which actually is on Ms. Bala's Certificate of Innocence. That's relating to this 1318 site, which was a separate site that was set up by RSI. That was the heart of the criminal action in which the argument was no taxes and no payments to charity were made from that site. And that went to account wagering that 1318 site? Correct. Okay. But significantly, for this matter, is team makers was not associated with the 1318 site. So I know Mr. Anderson had previously stated that team makers has a claim based on money not paid at the 1318 site, but each of the site operators was attached to an actual location and team makers' location was at the main office of RSI. Team makers and the State had offered no evidence to show that team makers was related to or associated with the 1318 site. So our argument is the 2009 opinion regarding the 1318 site, which Ms. Bala certainly disagrees with, is not relevant to this proceeding because it doesn't relate to team makers' right to payment from RSI. That was the opinion which affirmed the denial of her request for a Certificate of Innocence, right? Correct. But I think what they're saying is one of the reasons for the denial of the Certificate of Innocence was because they felt the trial court's finding that she was in fact guilty was not abuse of discretion or not incorrect, right? Yes. So two points on that. First, just to make it very clear, the entire criminal case was about the 1318 site, which had no association with team makers. So there's no claim originating from that. Second, the standard for a Certificate of Innocence is decidedly different. The question there was whether or not Ms. Bala was entitled to a Certificate of Innocence, which would then give her a right to sue the federal government for an unlawful conviction, essentially. So the standard is different, and we would argue that the findings that the 8th Circuit made or the holding of the 8th Circuit in 2009 certainly doesn't prove that Ms. Bala was guilty of anything wrong. It simply is a reason for the denial of the Certificate of Innocence. Thank you. I wanted to briefly just address a couple points that Mr. Anderson made. So Mr. Anderson has kind of gone back and forth between whether or not their claim is a contractual claim or a statutory claim, and the way we see it is that there's essentially two. There's a statutory-slash-constitutional claim that basically says that team makers have some type of right to payment under the Constitution or under the parimutuel statutes, and then there's no... Can I just interrupt you right there? Because when I look at the record, the hearing that you had the telephone status conference, and I thought I understood that the statutory claim is strictly a legal issue. Is that correct? I believe the main issue is purely legal. The only caveat that I would have is that you still need to prove the amount of the claim. So was that the purpose of the hearing that was conducted most recently in North Dakota, or did that go just to the contract claim? So we had three hearings in this matter. So the first one on April 24th was essentially a telephonic hearing, which the judge held to figure out what the issues were. The judge was prepared to rule at that hearing and indicated that he was willing to do so, but the state asked for additional time in order to get the actual assignment agreement from Team Acres, which the state did not have in April, even though it filed its claim at the end of December. And also the state wanted more time to get contracts that it could put into the record. So then the court scheduled an evidentiary hearing that was held at the end of May. That was the trial that everybody has referred to. That's where Mr. Foley testified and where the state sought to amend its claim to add the contract claim. That was before the last appeal of this court, right? Correct, yes. Then after that hearing, Judge Collins ruled on the Parents Patria issue and then ruled on Latches. This court affirmed the Parents Patria and then remanded on the Latches issue, and then Judge Collins had his status conference hearing. At that status conference hearing, prior to it, the state filed what is called the amended claim, the 51-2, and then Judge Collins issued a briefing schedule to address how he should resolve the issues. And so after that briefing, he then issued his most recent opinion. So there was no hearing after May? No evidentiary hearing, correct. No evidentiary hearing. Okay, thank you. Judge Collins' opinion, he views that the evidentiary hearing in May, after that, the evidentiary record was closed. Okay. And so any subsequent briefing was on legal issues and how he should interpret the evidence that was submitted at that hearing. Thank you. And that was May of 2020? May of 2019, Your Honor. Of 2019, thanks. That is very helpful. I'm sorry to interrupt. So if we could briefly just talk about, then, the basis for the statutory claim or the constitutional claim. The real flaw in that argument comes down to the calculation of net proceeds. So the state has sort of conceded, even today, that the takeout statute doesn't apply. The operative fact argument that it makes, I don't think, really survives the day because, as we show in Ms. Ball's appellee brief, that the account wagering system worked, whether or not the takeout statute existed, because Section 53-06.2-10.1, when authorizing account wagering, authorized RSI as a service provider to adopt the host jurisdiction takeout rate, which RSI then used to contract with various states. Right, but their point on that is that what you were authorized to use was the percentage, not the statute itself, and cites a number of cases interpreting similar statutes in other states. So what's your response to that? Right, so their argument was, without the takeout statute, which had a takeout rate, essentially, which is North Dakota's takeout rate, their argument is without that takeout rate in the takeout statute, RSI couldn't withhold any takeout. Wouldn't have authorization to pay its own expenses, et cetera. Right. Our response is, well, they're allowed to adopt the takeout rate percentage of the host jurisdiction, which was done by contract between RSI and the racetrack. The racetrack and RSI then withheld the takeout, and then RSI used those funds to pay its expenses, pursuant to the agreements that it had with the different site operators, including team makers. So the system worked without the takeout statute. The takeout statute really required that taxes were paid, provided what the North Dakota takeout rate was, required taxes to be paid, and then had this provision about payments to charities. And Ms. Ball's argument is the takeout statute wasn't necessary for the account wagering system to work because it had the host jurisdiction takeout percentage that it could use, and then it had its various contracts, which were all approved by the Racing Commission. And that is one other point that I wanted to highlight. So the parimutuel statutes created the Racing Commission, which oversees how account wagering and how the parimutuel system works. Each year RSI had to submit a license with the applicable contracts that it had with the site operators, including team makers, and the Racing Commission had to approve RSI's license each year. RSI also had to provide financial documentation to the Racing Commission demonstrating the amount of money that it was taking in, the amount of money it was paying to charities each year. And so this idea that somehow team makers was underpaid or wasn't paid enough, but the Racing Commission, which is an arm of the executive branch of North Dakota, continued to approve RSI's license, I think further proves that RSI was not underpaying team makers throughout this case. The final point that I wanted to make is on net proceeds, and this Court already asked Mr. Anderson about the different definitions of net proceeds. I'd point to the fact that the North Dakota legislature amended the statutes in 2007 to better incorporate account wagering into the parimutuel statutes. At that time, they did not adopt this definition of net proceeds that Mr. Anderson is urging this Court to adopt. They've left it blank. There is no definition of net proceeds currently in the statute. In fact, the current system works nearly identically to the system that the Racing Commissioner described, and that is that it's by contract. Right now, service providers negotiate separate contracts with each charity site operator, and they currently are capping the amount that the site operator gets paid. So Ballas Exhibits 43 and 44 are both current contracts between service providers and site operators in which the payment to charity is capped at $100,000 and $75,000. I thought I saw something in the record that suggested that the site operators didn't really play a role in account wagering because of the way things worked. Right, and that's where account wagering got really confusing. So under the previous simulcast system, there were physical sites. The OTB sites. The OTB sites that were basically associated with the different site operators. Right. And then RSI ran all the wagering and ran all the operations. Wagering based on account is not fixed to a location. Correct, and so RSI didn't know, and this really goes to the heart of the 8th Circuit's 2007 and 2015 opinion that there was a lot of uncertainty after account wagering was approved because the Racing Commission didn't promulgate any rules for how RSI was supposed to handle account wagering. And that was a lot of the reason why the conviction got overturned, correct? Correct. I'm trying to assess what impact it has on the problem we have. I'm sorry. I'm trying to assess what impact that has on the issues we're trying to sort out. Yeah, and I think on that point, it really shows where the State hasn't satisfied its burden. So the State is essentially asking this Court to write rules or write legislation that simply the 8th Circuit found wasn't in effect at the time of the account wagering in question. Can I have you address the motion to strike and sanctions that were filed? And I know that you're running out of time, but I'd like you to answer. I guess I'm reading that to indicate you take issue with the description of the funds being returned to the estate as part of an avoidance action. And can you tell me what it is you're seeking in terms of sanctions? Is it just the motion to strike? Because I think the way I have read these cases, that all of those preferential fraudulent transfer return of funds kind of all came out of the same case. So what difference does it make whether the funds came in as avoidance preference or just for a refund of payments that were not legally authorized? Your Honor, Ms. Ball would agree with you that it doesn't matter about whether or not this is an avoidance recovery because it doesn't actually provide a basis for team makers to have a claim. However, this argument was first raised in the reply brief, so Ms. Ball did not have an opportunity to respond. And to be perfectly honest with the Court, as detailed in Ms. Ball's appellee brief, the State has time and time again raised a brand-new argument after Ms. Ball has filed a brief, has brought new arguments up at trial, has simply filed things with the Court, raising brand-new issues. And this felt like just yet another step in this process that feels never-ending. And so Ms. Ball felt the need to file the motion to strike to basically say we're not going to have yet another set of new arguments that were raised so late. Okay, but I don't think that answered the question, what do you want? If we're going to sanction, what do you want? Your Honor, we'd ask that you strike the pages that we identified in the reply brief regarding this avoidance recovery argument. And then as far as sanctions, we ask for the costs associated with bringing the motion. Including attorney's fees? Yes, Your Honor. Thank you. Thank you. Did we have reserved time? No. Oh. You did not reserve rebuttal time. Well, you used it. Oh, I'm sorry. Okay. All right. Thank you.